UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Charles James Einck,                                        **Civil No. 10-2156 (RHK/SER)**

                Petitioner,


v.                                                          **REPORT AND RECOMMENDATION**


Joan Fabian,
Commissioner of Corrections,

                Respondent.
_____

      Rory Patrick Durkin, Esq., The Giancola Law Office, 403 Jackson Street, Suite 305, Anoka, Minnesota 55303, for Petitioner

      J. Richard Stermer, Esq., Chippewa County Attorney's Office, 102 Parkway Drive, P.O. Box 514, Montevideo, Minnesota, 56265, for Respondent.

_____

STEVEN E. RAU, United States Magistrate Judge

      Petitioner Charles James Einck ("Petitioner"), currently a state inmate at the Minnesota Correctional Facility at Stillwater, filed a Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody on May 26, 2010.  [Doc. No. 1].  Petitioner alleged one ground for relief:  admission of prior act evidence in his jury trial violated his right to due process because the prior act evidence was so conspicuously prejudicial that it fatally infected his trial and deprived him of fundamental fairness.  Respondent Joan Fabian ("Fabian") filed a response to the Petition arguing that the trial court's evidentiary ruling was proper and did not deprive Petitioner of Due Process.  [Doc. No. 7].  The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of

1

Minnesota Local Rule 72.1. For the reasons discussed below, the Court recommends that the Petition be denied and that this action be dismissed.

## I. BACKGROUND

In June 2008, a Minnesota state court jury found Petitioner guilty of the following: first-degree criminal sexual conduct in violation of Minn. Stat. § 609.342, subd.1(c) (fear of imminent great bodily harm); first-degree criminal sexual conduct in violation of Minn. Stat. § 609.342, subd. 1(d) (armed with a dangerous weapon); first-degree criminal sexual conduct in violation of Minn. Stat. § 609.342, subd. 1(e)(i) (personal injury and force or coercion); first-degree criminal sexual conduct in violation of Minn. Stat. § 609.342, subd. 1(e)(ii) (personal injury and physically helpless); second-degree assault in violation of Minn. Stat. § 609.222, subd. 2 (dangerous weapon); and kidnapping in violation of Minn. Stat. § 609.25, subds. 1(2) and 2(2) (unsafe release or great bodily harm). *State v. Einck*, No. A08-1949, 2009 WL 3735725, at *3 (Minn. Ct. App. Nov. 10, 2009). Petitioner is presently serving his 180-month sentence at the Minnesota Correctional Facility in Stillwater, Minnesota. (Pet. at 1).

Petitioner unsuccessfully appealed his conviction to the Minnesota Court of Appeals. The Minnesota Court of Appeals summarized the factual background of the case.

> On November 8, 2007, appellant met E.J. for the first time at the Northern Lights Bar in Montevideo. Appellant drove E.J. to another bar in Watson, and later drove her to a gravel road in an isolated area where they had sexual intercourse. . . . Appellant testified that E.J. volunteered to go to Watson with him where they drank and flirted at the bar, that appellant chose to take the back roads home because he had been drinking . . . According to appellant, he and E.J. stopped en route and engaged in consensual sex, but then he ordered E.J. to leave his truck when he saw her preparing to smoke methamphetamine. . . . [He] felt guilty about leaving E.J. "in the middle of nowhere," stopped his truck, and drove back to E.J. to give her a ride home. . . . Appellant testified that when E.J. got out of his truck in Montevideo, she walked to her car apparently without injury.

But E.J. testified that neither the trip to Watson nor the sexual intercourse was consensual. According to E.J.'s testimony, while she was at the Northern Lights Bar in Montevideo, appellant asked her if she wanted to go to Watson; E.J. replied that she needed to go home instead. Appellant offered her a ride home in his truck, but drove her to Watson instead and refused E.J.'s repeated requests to take her home. . . . By the time the bar [in Watson] closed at around 10:00 p.m., E.J. had not succeeded in finding someone else to give her a ride home and asked appellant to bring her home. Although appellant had taken the main highway into Watson, he took the back roads out of town, telling E.J. that he was less likely to run into police that way.

According to E.J., appellant drove on a gravel road that E.J. was unfamiliar with, and began making sexual comments to her. He then pulled over and stopped the truck. When E.J. asked appellant why he stopped, appellant replied that E.J. owed him for the drinks he bought her. E.J. replied that she did not owe appellant anything and was willing to buy her own drinks, but appellant responded that one way or another, they were going to have sex. When E.J. refused, appellant then told her to get out of his truck and walk home.

E.J. exited the truck and began walking away. Appellant then drove his truck in reverse and rammed into E.J. hard enough to make her fly forward into the ground. E.J. stood up and told appellant that she was going to turn him in. When E.J. started writing down appellant's license plate number, appellant tried to take her purse. E.J. turned and ran away but fell. Appellant got into his truck and drove "pretty fast" towards her. E.J. tried to roll out of the way, but appellant drove over her leg and the side of her hip. In "excruciating pain," unable to walk, and afraid appellant would run her over again and kill her, E.J. tried to drag herself into the trees to hide. . . . [A]ppellant yelled at her to come out and he would take her home. E.J. responded that she could not walk, so appellant picked her up and put her in his truck.

Appellant then told E.J. that he was going to "get what he wanted" before he took her home. E.J. again refused, but appellant pulled her pants down from behind, although he was unable to completely remove them because E.J. could not move her legs. E.J. testified that she cried and screamed but was unable to physically resist. Appellant vaginally penetrated E.J. with his penis, assaulting her for three to five minutes . . . Appellant told E.J. that he wanted to take her to his own house, and E.J. agreed, hoping that appellant would take her into town.

3

> As they drove back, appellant told E.J. that he preferred oral sex; he pulled E.J.'s head down and forced his penis into her mouth. Later, as they reached Montevideo, E.J. told appellant that she could not go to his house unless she moved her car. Appellant agreed, but told E.J. that he wanted her to follow him to his house. Appellant helped E.J. into her car, but E.J. shut and locked the doors. E.J. then drove home and sought help.
>
> E.J. was brought to the hospital, and diagnosed with a broken pelvis. The doctor who treated E.J. in the emergency room . . . testified that E.J.'s injury was consistent with a compressive fracture of the hip, being hit on the hip "by a force." . . . E.J. also had multiple abrasions. . . . [S]emen was found on E.J.'s vaginal swab containing a DNA mixture from which neither E.J. nor appellant could be excluded.

*Einck*, 2009 WL 3735725, at *1-2.

On appeal, Petitioner argued that the trial court erred in allowing *Spreigl*[1] evidence of a prior sexual assault against his ex-wife. (Appellant's Brief to Court of Appeals, Ex. 1, Attached to the Respondent's Appendix "Resp't App.") [Doc. No. 8].[2] Applying the multi-factor test for admissibility of *Spreigl* evidence, the Minnesota Court of Appeals ruled that the admission of the *Spreigl* evidence was not error. *Einck*, 2009 WL 3735725, at *3-6. The Minnesota Supreme Court denied Petitioner's request for review on January 27, 2010. (Minnesota Supreme Court Order Ex. 6, Attached to Resp't App) [Doc. No. 10].

Petitioner challenges the trial court's findings from the May 30, 2008 pretrial hearing on the admissibility of his ex-wife's ("J.E.") testimony that he raped her in 2004. (Transcript of *Spreigl* Hearing 5-30-2008, Ex. 16, Attached to Resp't App.) [Doc. No. 13]. J.E. testified to the following. She was married to but divorced from Petitioner in 2004.[3] (*Id.* at 74). In 2008, while

---

[1] In Minnesota, evidence of past crimes or bad acts is called *Spreigl* evidence. *See State v. Spreigl*, 139 N.W.2d 167 (Minn. 1965); *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn. 1998).
[2] Petitioner raised several other arguments in the Minnesota Court of Appeals that he did not raise in his habeas petition.
[3] Later, it was determined the divorce was final in early 2005.

4

he was under investigation for the crimes against E.J., Petitioner called J.E., asking her to speak to his defense investigator and say that nothing happened between them in 2004. (*Id.* at 75-76). J.E. agreed because she did not want to be involved. (*Id.* at 76-78). Because of a past history of violence, J.E. feared Petitioner. (*Id.*) When the investigator contacted her and asked her what happened in 2004, J.E. said nothing happened, in effect, she asserted that the previous rape allegation was a fabrication. (*Id.* at 78).

At the 2008 evidentiary hearing, J.E. testified that on February 10, 2004, she was at work. (*Id.* at 79). She was separated from Petitioner at that time. (*Id.* at 80). When she left work, her Jeep was missing. (*Id.*) Petitioner called her and said he took the Jeep, but he would pick her up and give the Jeep back after she gave him a ride, twelve miles away. (*Id.* at 80-81). In the Jeep, they argued about ending their marriage. (*Id.* at 82). Petitioner drove down a gravel maintenance road, shut off the Jeep, and took J.E.'s cell phone and turned it off. (*Id.* at 82-83). Petitioner's statements scared J.E., so she got out of the car and started walking. Petitioner followed and pushed her, telling her to get back in the car. (*Id.* at 83). Petitioner told J.E. there was a gun in the car. He threatened her. And then he threatened to kill himself. (*Id.* at 83-84). Petitioner said he wanted to be with her one last time and told her to get in the backseat. (*Id.* at 84). J.E. tried to talk him out of it, but eventually got in the backseat because she was afraid for her life. (*Id.*)

In the backseat, Petitioner forced J.E. to perform oral sex on him. (*Id.* at 84-85). Petitioner also took J.E.'s pants off after she told him no. (*Id.* at 85). He vaginally penetrated her with his penis. (*Id.*) Petitioner got out of the car and J.E. got in the front seat to get her phone and noticed Petitioner had removed the cell phone's battery. (*Id.* at 86). She put the phone together and tried to call the police unsuccessfully. (*Id.*) Petitioner called a friend to pick

them up, because the Jeep would not start. (*Id.*) Petitioner's friend dropped J.E. off in town, and the police picked her up. (*Id.* at 87). After going to the hospital, J.E. made a statement to the police. (*Id.*)

After J.E. got the Jeep back from the police, the Jeep was destroyed. (*Id.* at 87-88). J.E. told police she did not know what happened to the Jeep, but she knew more than she told; J.E.'s boyfriend and his brother destroyed the Jeep. (*Id.* at 88, 93). J.E. watched them smash the Jeep's windows but told law enforcement she did not see anything. (*Id.* at 93-94). J.E. believed the 2004 prosecution of Petitioner for raping her was dismissed because she lied about the Jeep. (*Id.* at 96-97). When J.E. spoke to Petitioner's investigator in April 2008, J.E. said she made up the story about the rape, because they were fighting over the Jeep and the divorce. (*Id.* at 97-100). When she talked to the prosecutor, she agreed to testify about the rape. (*Id.* at 102-03.) The defense investigator called J.E. again, and J.E. apologized for lying that nothing happened in 2004. (*Id.* at 103.)

After the hearing, the trial court held the alleged prior rape of J.E. on or about February 10, 2004, was established by clear and convincing evidence. (Order on Evidentiary Hearing, Ex. 17 at 148, Attached to Resp't App.) [Doc. No. 13]. The court considered the five-factor test for admissibility of evidence of other crimes offered for a noncharacter purpose under Minnesota Rule of Evidence 404(b): (1) proper notice by prosecutor of intent to admit the evidence; (2) clear indication by prosecutor of what the evidence will be offered to prove; (3) defendant's involvement in act must be proven by clear and convincing evidence; (4) evidence must be relevant to prosecutor's case; and (5) probative value of the evidence must not be outweighed by potential to unfairly prejudice the defendant. (*Id.* at 149-51).

The trial court held that J.E. recanted out of fear of reprisal and to protect her family. (*Id.* at 150). In addition, J.E. was not under oath when she recanted her statements to the defense investigator. (*Id.*) After cautionary instruction, J.E. was allowed to testify at trial regarding the events of February 10, 2004, for the purpose of showing a common scheme or plan. (Transcript of Testimony of J.E., Ex. 13 at 98-134, Attached to Resp't App.) [Doc. No. 12].

Petitioner filed this habeas corpus petition on May 26, 2010. Petitioner alleges his Constitutional right to due process was violated when the trial court determined that the prior bad acts evidence was proven by clear and convincing evidence. Petitioner also contends he was denied the right to a fair trial, and his right to due process was violated when the trial court determined that the prior bad acts evidence was admissible to show a common scheme or plan. For the reasons discussed below, the Court finds that Petitioner is not entitled to relief.

## II.   DISCUSSION

### A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 28 U.S.C.) ("AEDPA") prescribes the standards that govern this Court's substantive review of Einck's Habeas Petition. The relevant portion of AEDPA provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 405-11 (2000), the United States Supreme Court discussed how federal district courts should apply the AEDPA.  State court decisions are "contrary to" Supreme Court precedent under § 2254(d) when the state court:  (1) reaches a conclusion opposite to the Supreme Court on a question of law; or (2) arrives at a result opposite to Supreme Court precedent involving "materially indistinguishable" facts.  *Id.* at 405.  The "unreasonable application" clause of § 2254(d)(1) provides that even if the state court correctly identifies the relevant Supreme Court principle, a federal court may grant a prisoner's writ if the state court applied the principle unreasonably to the facts of the case.  *Id.* at 413.  The standard for determining whether a state court's decision is an "unreasonable application," is "whether the state court's application of clearly established federal law was **objectively unreasonable.** . . ." *Id.* at 409 (emphasis added).  A writ may not be issued simply because the federal court concludes the state court's application of federal law was erroneous or incorrect, but only where the state court's decision was also unreasonable.  *Id.* at 411.

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Habeas relief can therefore, be granted if the conviction is based on findings of fact that could not be derived reasonably from the state court evidentiary record.  When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct,"

and such a presumption "may be rebutted only by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).

Needless to say, a federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted in *Williams*.

Any challenge of a state court evidentiary ruling implicates an even more restrictive standard.

> The admissibility of evidence in a state trial is a matter of state law. . . . When a petitioner's federal habeas corpus claim is based upon a theory which can be determined as a matter of state law, the federal court is bound by a state court's interpretation of state law. . . . Although the admissibility of evidence at a state trial is a matter of state law and ordinarily will not form the basis for federal habeas relief, a federal court may grant habeas relief when a state court's evidentiary ruling "infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process." Turner v. Armontrout, 845 F.2d 165 (8th Circuit 1988).

*Clark v. Groose*, 16 F.3d 960, 963 (8th Cir. 1994) (internal citations omitted). "The inquiry is not 'whether the trial court erred in admitting the particular testimony,' but 'whether the admissions resulted in a trial so fundamentally unfair as to deny [the petitioner] due process of law.'" *Rainer v. Dep't of Corrections*, 914 F.2d 1067, 1072 (8th Cir.1990) (quoting *Hobbs v. Lockhart*, 719 F.2d 125, 127-28 (8th Cir. 1986)). To meet this standard, "the error must be so 'gross[,]' . . . 'conspicuously prejudicial[,]' . . . or otherwise of such magnitude that it fatally infected the trial and failed to afford [the petitioner] the fundamental fairness which is the essence of due process." *Id.* at 1072 (quoting *Mercer v. Armontrout*, 844 F.2d 582, 587 (8th Cir. 1988)).

9

**B.     State Evidentiary Ruling**

Petitioner contends admission of the *Spreigl* evidence was so prejudicial that he was denied fundamental fairness because the evidence had no probative value, and was grossly prejudicial. Petitioner offers two reasons why the evidence was not probative. First, Petitioner contends J.E.'s testimony was unreliable because she changed her story several times. After hearing J.E.'s testimony, the trial court reasonably found her testimony reliable based on the amount of detail J.E. was able to provide. The state court also believed J.E.'s explanation for why the 2004 rape charge was not prosecuted, and why she recanted her rape allegations in 2008. J.E.'s testimony was not so unreliable that its admission deprived Petitioner of fundamental fairness.

Second, Petitioner asserts the evidence did not show a common scheme or plan because the facts were generic. Petitioner argues that all parties lived in rural areas, therefore, it is insignificant that the alleged rapes both occurred in rural areas. Petitioner also asserts the fact that both incidents allegedly occurred in motor vehicles, and both involved vaginal and oral sex, are nothing more than generic facts.

Petitioner's arguments are not persuasive. The similarities begin with Petitioner being in control of the situation because each woman needed a ride home. Each woman testified that instead of driving to the intended destination, Petitioner drove down remote back roads and stopped the vehicle. Each woman testified Petitioner wanted to have sex, and she said no. Each woman testified that Petitioner stopped her from calling for help, by trying to taking E.J.'s purse, then running her over, and by taking J.E.'s cell phone. Each woman got out of the car and Petitioner threatened both to get back in the car. J.E. said Petitioner pushed her when she got out of the car, but he also threatened her by saying he had a gun in the car. Petitioner ran E.J. over

10

when she got out of the car, and she could not walk or run to escape. Both rapes occurred in a vehicle in a similar manner. Each woman's testimony is quite similar. J.E.'s testimony was offered legitimately as evidence of a common scheme or plan.

Petitioner contends the evidence was so prejudicial as to amount to a deprivation of fundamental fairness because he would not likely have been convicted but for admission of the *Spreigl* evidence. The case was his word against E.J.'s word, and the defense attorney shattered E.J.'s credibility, because she was drunk and high at the time of the incident. This Court disagrees. Evidence showed E.J.'s injuries were consistent with her testimony. It does not violate due process to admit evidence that suggests a propensity to commit a crime if it is offered for another purpose, and the jury is instructed on how it may consider the evidence. *See Dowling v. U.S.*, 493 U.S. 342, 353-54 (1990) (especially in light of judge's limiting instruction, admission of evidence of prior burglary did not violate due process even though defendant was acquitted of charges of prior burglary); *U.S. v. Sparkman*, 500 F.3d 678, 684-85 (8th Cir. 2007) (jury instruction was adequate to inform jury of limited permissible use of evidence of prior bad acts). In sum, Petitioner failed to show admission of the *Spreigl* evidence was so prejudicial as to deny him fundamental fairness in trial.

### C.     Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal a denial of his petition unless he is granted a Certificate of Appealability, ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted, unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000).

The issue raised here is a straightforward allegation that a state court evidentiary ruling resulted in denial of due process. It is unlikely another court would resolve the issue differently, given the highly deferential review of state evidentiary rulings and the facts presented in this case. This Court therefore recommends that if the District Court adopts this Report and Recommendation, a COA should not issue.

### III.    RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody [Doc. No. 1] be **DENIED**;

2.    This action be **DISMISSED WITH PREJUDICE**; and

3.    Petition NOT be granted a Certificate of Appealability.


Dated:  March 15, 2012

                                                *s/Steven E. Rau*
                                                STEVEN E. RAU
                                                United States Magistrate Judge


Under D.Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 29, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.